UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| AARON DALE DODSON, | |
| Plaintiff, | Case No. 2:20-cv-00048 |
| v. | Chief Judge Waverly D. Crenshaw, Jr. |
| | Magistrate Judge Alistair E. Newbern |
| SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

To:    The Honorable Waverly D. Crenshaw, Jr., Chief District Judge

**REPORT AND RECOMMENDATION**

Plaintiff Aaron Dale Dodson filed this action under 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of the Social Security Administration (SSA) denying his application for supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. (Doc. No. 1.) The Court referred this action to the Magistrate Judge to dispose or recommend disposition of any pretrial motions under 28 U.S.C. § 636(b)(1)(A) and (B). (Doc. No. 5.) Before the Court is Dodson's motion for judgment on the administrative record (Doc. No. 27), to which the Commissioner has responded in opposition (Doc. No. 28), and Dodson has replied (Doc. No. 29). Having considered the parties' arguments and the administrative record as a whole, and for the reasons that follow, the Magistrate Judge will recommend that the Court grant Dodson's motion for judgment on the administrative record.

I.    **Factual and Procedural Background**

   A.    **Dodson's SSI Application**

Dodson applied for SSI on February 8, 2016, alleging that he had been disabled and unable to work since February 7, 2016, because of intellectual disability, panic disorder, bipolar disorder,

agoraphobia, knee problems, hearing impairment, and petit mal seizures. (AR 803–04.[1]) The

Commissioner denied Dodson's application initially and on reconsideration. (AR 823, 846.) At

Dodson's request, an administrative law judge (ALJ) held a hearing regarding his application on

December 19, 2018. (AR 41–75, 866–68.) Dodson appeared with counsel and testified. (AR 41,

49–69.) The ALJ also heard testimony from a vocational expert. (AR 69–74.)

### B.     The ALJ's Findings

On April 3, 2019, the ALJ issued a written decision finding that Dodson was not disabled

within the meaning of the Social Security Act and denying his claim for SSI. (AR 18–34.) The

ALJ made the following enumerated findings:

1.      The claimant has not engaged in substantial gainful activity since February 8, 2016, the application date (20 CFR 416.971 *et seq.*).

                    *       *       *

2.      The claimant has the following severe impairments: Dysfunction of major joints, affective disorders, anxiety disorders, neurodevelopmental disorders, personality disorders, and hearing loss not treated with cochlear implantation (20 CFR 416.920(c)).

                    *       *       *

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

                    *       *       *

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b). He could lift and/or carry 20 pounds occasionally, 10 pounds frequently. He can stand and/or walk, with normal breaks, for a total of 6 hours per 8-hour workday, and can sit, with normal breaks, for a total of 6 hours per 8-hour workday. He could occasionally push/pull with the lower left extremity. In terms of postural limitations, he can never climb ladders, ropes, or scaffolds, but

---

[1]      The transcript of the administrative record (Doc. No. 23) is referenced herein by the abbreviation "AR." All page numbers cited in the AR refer to the Bates stamp at the bottom right corner of each page.

can occasionally kneel or crawl, climb ramps and stairs, balance, stoop, and crouch. In terms of communicative limitations, he is limited to jobs, which do not require constant public interaction or constant use of the telephone. Further, in terms of communicative limitations, he is restricted to work in an environment with a "moderate noise intensity level," as the Selected Characteristics of Occupations defines that term, which gives examples of light traffic, a grocery store, or a department store. In terms of environmental limitations, he must avoid all exposure to unprotected heights and moving mechanical parts. In terms of mental limitations, he is restricted to the performance of simple, routine and repetitive tasks. He is limited to low-stress work, which is defined as requiring few decisions or judgments to be made, and few changes in a routine work setting. He can never tolerate exposure to the general public. He can work in close proximity to others, but with only brief, incidental interaction with others and no tandem job tasks. He could work where supervisors occasionally interact with the worker throughout the day. Work should not be above a 7th grade reading level. He would be off task no greater than 10% of workday.

\* \* \*

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

\* \* \*

6.    The claimant was born on August 8, 1980, and was 35 years old, which is defined as a younger individual age 18–49, on the date the application was filed (20 CFR 416.963).

7.    The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

\* \* \*

10.    The claimant has not been under a disability, as defined in the Social Security Act, since February 8, 2016, the date the application was filed (20 CFR 416.920(g)).

(AR 23–34.) On June 4, 2020, the Appeals Council denied Dodson's request for review, making

the ALJ's decision the final decision of the Commissioner. (AR 1–7.) The Appeals Council

declined to consider additional evidence that Dodson submitted after the administrative hearing, finding that the evidence either did not show a reasonable probability that it would change the outcome of the ALJ's decision or did not relate to Dodson's alleged period of disability. (AR 2.)

### C. Appeal Under 42 U.S.C. § 405(g)

Dodson filed this action for review of the ALJ's decision on August 7, 2020 (Doc. No. 1), and this Court has jurisdiction under 42 U.S.C. § 405(g). Dodson argues that the ALJ erred in determining that his mental impairments do not meet or medically equal one of the impairments on the SSA's list of impairments that are considered severe enough to be disabling. (Doc. No. 27-1.) Dodson also argues that the ALJ erred in failing to properly consider limitations caused by Dodson's hearing loss in the residual functional capacity determination and the hypothetical question posed to the vocational expert during the administrative hearing. (*Id.*) He also asserts that remand is warranted under sentence six of 42 U.S.C. § 405(g) for consideration of the evidence he submitted to the appeals council after the administrative hearing. (Doc. No. 27-1.) The Commissioner responds that substantial record evidence, including evidence that Dodson did not consistently take his prescribed medications, supports the ALJ's determination that Dodson's mental impairments were not severe enough to be disabling and the ALJ's RFC findings. (Doc. No. 28.) The Commissioner also argues that sentence-six remand is not warranted because Dodson has not shown that the additional evidence submitted to the Appeals Council is new, material, and that there was good cause for not submitting it to the ALJ before the hearing. (*Id.*) Dodson replies that any failure to consistently obtain treatment for his impairments was due to his lack of personal resources and does not preclude a finding of disability. (Doc. No. 29.) He also reiterates that the ALJ's hypothetical question and RFC determination were incomplete because they did not account for his hearing impairment. (*Id.*)

### D. Review of the Record

The ALJ and the parties have thoroughly described and discussed the medical and testimonial evidence in the administrative record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

## II. Legal Standard

### A. Standard of Review

This Court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings are supported by substantial evidence and (2) whether the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (alteration in original) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is less than a preponderance but "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consol. Edison Co.*, 305 U.S. at 229); *see also Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (same). Further, "[t]he Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Gentry*, 741 F.3d at 723. Where an ALJ fails to follow those rules or regulations, "we find a lack of substantial evidence, 'even where the conclusion of the ALJ may be justified based upon the record.'" *Miller*, 811 F.3d at 833 (quoting *Gentry*, 741 F.3d at 722).

5

## B.     Determining Disability at the Administrative Level

Dodson applied for SSI under Title XVI of the Social Security Act, which "is a welfare program" that provides "benefits to financially needy individuals who are aged, blind, or disabled regardless of their insured status." *Bowen v. Galbreath*, 485 U.S. 74, 75 (1988). "Disability" is defined in this context as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (explaining that this definition applies to SSI claims under Title XVI as well as disability insurance benefit claims under Title II).

ALJs must employ a "five-step sequential evaluation process" to determine whether a claimant is disabled, proceeding through each step until a determination can be reached. 20 C.F.R. § 416.920(a)(4). At step one, the ALJ considers the claimant's work activity. 20 C.F.R. § 416.920(a)(4)(i). "If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis." *Garcia v. Sec'y of Health & Human Servs.*, 46 F.3d 552, 554 n.2 (6th Cir. 1995). At step two, the ALJ determines whether the claimant suffers from "a severe medically determinable physical or mental impairment" or "combination of impairments" that meets the 12-month durational requirement. 20 C.F.R. § 416.920(a)(4)(ii). "If the claimant does not have a severe impairment or combination of impairments, benefits are denied without further analysis." *Garcia*, 46 F.3d at 554 n.2. At step three, the ALJ considers whether the claimant's medical impairment or impairments appear on a list maintained by the SSA that "identifies and defines impairments that are of sufficient severity as to prevent any gainful activity." *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); *see* 20 C.F.R. § 416.920(a)(4)(iii). "If the severe impairment meets or equals one of the impairments listed in the regulations, the claimant

is conclusively presumed to be disabled without further analysis." *Garcia*, 46 F.3d at 554 n.2. If not, the ALJ proceeds to step four.

At step four, the ALJ evaluates the claimant's past relevant work and "residual functional capacity" 20 C.F.R. § 416.920(a)(4), which is defined as "the most [the claimant] can still do despite [his] limitations" *id.* § 416.945(a)(1); *see id.* § 416.920(a)(iv). Past work is relevant to this analysis if the claimant performed the work within the past 15 years, the work qualifies as substantial gainful activity, and the work lasted long enough for the claimant to learn how to do it. *Id.* § 416.960(b)(1). If the claimant's residual functional capacity (RFC) permits him to perform past relevant work, "benefits are denied without further analysis." *Garcia*, 46 F.3d at 554 n.2. If a claimant cannot perform past relevant work, the ALJ proceeds to step five and determines whether, in light of his residual functional capacity, age, education, and work experience, a claimant can perform other substantial gainful employment. 20 C.F.R. § 416.920(a)(4)(v). While the claimant bears the burden of proof during the first four steps, at step five the burden shifts to the Commissioner to "identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011). "If the claimant is able to perform other work in the national economy, . . . benefits are denied." *Garcia*, 46 F.3d at 554 n.2. If the claimant is unable to perform other work, the ALJ will find that the claimant is disabled.

III.    **Analysis**

A.      **The ALJ's Analysis of Dodson's Mental Impairments at Step Three**

"The Listing of Impairments . . . in appendix 1 of subpart P of part 404 of" chapter III of title 20 of the Code of Federal Regulations "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing

7

any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 416.925(a).

"Paragraph A of each listing (except 12.05) includes the medical criteria that" a claimant's medical evidence must meet to show that the claimant has the impairment in that listing. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A)(2)(a).

"Paragraph B of each listing (except 12.05)" requires that a claimant have one "'extreme' limitation" or two "'marked' limitation[s]" in the following "areas of mental functioning[:]" (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *Id.* § 12.00(A)(2)(b). An individual with an "[e]xtreme limitation" in one of these areas is "not able to function in th[e] area independently, appropriately, effectively, and on a sustained basis." *Id.* § 12.00(F)(2)(e). A "[m]arked limitation" means an individual's "functioning in th[e] area independently, appropriately, effectively, and on a sustained basis is seriously limited." *Id.* § 12.00(F)(2)(d). By contrast, a "[m]oderate limitation" means an individual's "functioning in th[e] area independently, appropriately, effectively, and on a sustained basis is fair." *Id.* § 12.00(F)(2)(c).

"Paragraph C of listings 12.02, 12.03, 12.04, 12.06, and 12.15" requires a showing that the individual has "a medically documented history of the existence of the disorder over a period of at least 2 years," *id.* § 12.00(A)(2)(c), and evidence satisfying both paragraphs (C)(1) and (C)(2), which require: (1) reliance on ongoing "medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs of [the individual's] mental disorder . . ."; and (2) "marginal adjustment[,]" which means "hav[ing] minimal capacity to adapt to changes in [one's] environment or to demands that are not already

part of [one's] daily life[,]" *id.* § 12.00(G)(2)(b)–(c). The ongoing medical treatment criterion in paragraph (C)(1) is satisfied "when the medical evidence establishes that [the claimant] obtain[s] medical treatment with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for [the claimant's] medical condition." *Id.* § 12.00(G)(2)(b). The marginal adjustment criterion in paragraph (C)(2) is satisfied "when the evidence shows that changes or increased demands have led to exacerbation of [the claimant's] symptoms and signs and to deterioration in [the claimant's] functioning[.]" *Id.* § 12.00(G)(2)(c). "[F]or example, [the claimant] ha[s] become unable to function outside of [his] home or a more restrictive setting, without substantial psychosocial supports . . . ." *Id.* Psychosocial supports may include "receiv[ing] help from family members or other people who monitor [the claimant's] daily activities and help [the claimant] to function. *Id.* § 12.00(D)(1)(a).

The ALJ considered whether Dodson's mental impairments met the criteria of listings 12.02 (neurocognitive disorders), 12.03 (schizophrenia spectrum and other psychotic disorders), 12.04 (depressive, bipolar, and related disorders), 12.05 (intellectual disorders), 12.06 (anxiety and obsessive-compulsive disorders) and listing 12.08 (personality and impulse-control disorders). (AR 24–28 (citing 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.03–12.06, 12.08).)

The ALJ found that the medical evidence did not show that Dodson has symptoms of intellectual disability that satisfied paragraph A or B of listing 12.05 or symptoms of schizophrenia that satisfied paragraph A of listing 12.03 or the duration requirement of 20 C.F.R. § 416.909. (AR 25–26.) She also found that Dodson "may have depressive disorder characterized by symptoms" as required by paragraph A of listing 12.04, but that Dodson's "mental impairments, considered singly and in combination, do not" satisfy the paragraph B criteria of listings 12.02, 12.03, 12.04, 12.06, and 12.08, or the paragraph C criteria of listings 12.03, 12.04, and 12.06.

(AR 25–27.) Dodson argues that the record lacks substantial evidence to support the ALJ's findings that Dodson does not meet the criteria of listings 12.02, 12.03, 12.04, 12.06, and 12.08.[2] (Doc. No. 27-1, 29.) The Commissioner responds that the ALJ's determinations are supported by substantial record evidence. (Doc. No. 28.)

### 1.    Paragraph A of Listing 12.03

Listing 12.03 describes "[s]chizophrenia spectrum and other psychotic disorders[,]" which may include "schizophrenia, schizoaffective disorder, delusional disorder, and psychotic disorder due to another medical condition." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(B)(2)(b). Paragraph A of listing 12.03 requires "[m]edical documentation of one or more of the following: (1) [d]elusions or hallucinations; (2) [d]isorganized thinking (speech); or (3) [g]rossly disorganized behavior or catatonia." *Id.* § 12.03(A)(1)–(3). The SSA promises claimants that, in evaluating the effects of the claimant's mental impairment, the SSA "will consider how often [the claimant] ha[s] exacerbations and remissions, how long they last, what causes [the claimant's] mental disorder to worsen or improve, and any other relevant information." *Id.* The SSA "will not find that [a claimant is] able to work solely because [he] ha[s] a period(s) of improvement (remission), or that [he is] disabled solely because [he] ha[s] a period of worsening (exacerbation), of [his] mental disorder." *Id.*

The ALJ offered the following analysis of Dodson's symptoms under listing 12.03's paragraph A criteria and 20 C.F.R. § 416.909's duration requirement:

> From the alleged onset date until September 2018, there is no medical documentation of delusions, hallucinations, disorganized thinking, or grossly disorganized behavior or catatonia. He reported hallucinations, "now and then" but was not certain if he actually heard voices or if it was his conscience (Exhibits B14F and B18F). On medical examinations, no altered mental status was noted

---

[2]    Dodson does not challenge the ALJ's finding that he does not meet the paragraph A and B criteria of listing 12.05.

(Exhibits B12F, B15F, and B16F). Although the claimant reported treatment for a diagnosis of schizoaffective disorder (Exhibit B5F, p. 10), there is no definitive diagnosis other than from self-report since 2015 (Exhibits B4F, B5F, B6F) until September 2018 when Nurse Practitioner, Trena Lawson diagnosed unspecified schizophrenia and panic disorder (episodic paroxysmal anxiety) (Exhibit B21F, pp. 17, 30). A severe impairment must last 12 months or be expected to result in death to satisfy the duration requirement (20 CFR 416.909).

(AR 25.)

The ALJ's conclusion that Dodson's mental impairments do not meet listing 12.03 is not supported by substantial record evidence. The ALJ erred in focusing his inquiry only on a period of time beginning at the alleged onset date of February 7, 2016, instead of considering longitudinal evidence of Dodson's mental condition over a longer period of time. The Social Security regulations recognize that a claimant's level of functioning may vary over time and that longitudinal evidence is required to evaluate mental impairments. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(5)(a) ("Longitudinal medical evidence can help us learn how you function over time, and help us evaluate any variations in the level of your functioning. We will request longitudinal evidence of your mental disorder when your medical providers have records concerning you and your mental disorder over a period of months or perhaps years . . . .") The regulations also recognize that "[c]ertain situations, such as chronic homelessness, may make it difficult for [a claimant] to provide longitudinal medical evidence" or may interfere with the claimant's relationship with the medical community and ability to receive treatment. *Id.* § 12.00(C)(5)(b).

The extensive longitudinal medical evidence in this case, summarized below, demonstrates that Dodson has experienced delusions, hallucinations, disorganized thinking, and catatonia for years and that those symptoms occurred both before and after his alleged onset date.

On November 12, 2010, Dodson reported racing thoughts and auditory and visual hallucinations, including voices that told him to "do the wrong things" and visions of "'things that

happen in the future.'" (AR 1070.) He was admitted to Volunteer Behavioral Health Care System's Crisis Stabilization Unit (CSU) for inpatient psychiatric treatment from November 12 through 15, 2010. (AR 1070–78, 1081–86.) A nurse practitioner noted that Dodson "has somatic issues, [and] doesn't believe he is ok physically." (AR 1077.) After his discharge from the CSU, Dodson attended a follow-up appointment on November 23, 2010 (AR 1079–80), but failed to return for continued treatment (AR 1089–90).

On August 15, 2013, a friend of Dodson's reported that Dodson "has episodes daily where he blanks out, get[s] sad, teary, will slur his words, [is] difficult to understand, freeze[s] up, and [is] different." (AR 1180.) Dodson was referred for a neurologic evaluation on January 28, 2014, after his then-girlfriend reported "an episode in which [Dodson] seemed to abruptly stare[,] [h]is jaw locked up, he may have bitten his tongue, and he appeared to be bewildered and wanted to go to sleep." (AR 1091.) She also reported "many episodes in which [Dodson] abruptly says he is angry or tearful, and yet shows no emotion . . . ." (*Id.*) After conducting an unremarkable CT scan and observing Dodson making "statements of 'I am angry' and yet show[ing] no expression[,]" neurologist Thomas M. Banas, M.D., opined that Dodson's symptoms suggested "an emotionally-charged, dissociative state . . . ." (AR 1092.)

A series of treatment plans developed by providers at the Bowen Center in Indiana between February 7, 2014, and May 5, 2016, indicate that Dodson received mental health treatment directed at addressing his auditory hallucinations. (AR 1348–65.) Those treatment plans and other notes from the Bowen Center during this period state that Dodson "hears voices that tell him that others are out to get him and will cause harm, which initiates panic attacks. He is scared to be around others or in the community." (AR 1309, 1312, 1314, 1318, 1320, 1322, 1324, 1326, 1328, 1332, 1334, 1348, 1350, 1352, 1354, 1356, 1358, 1360, 1362, 1371, 1374, 1377, 1539, 1542, 1544, 1549,

1551, 1553, 1555, 1557, 1559, 1563.) On May 14, 2014, Dodson reported to therapist Meggan Planck that he was experiencing "distress, anxiety, and hearing voices." (AR 1336–37.) On September 10, 2014, Planck observed that Dodson "was restless and repeated himself." (AR 1325.) During this time period, Dodson's providers also noted that he was "homeless, has no income or resources and doesn't feel like he has a purpose or reason to live. [Dodson] is unable to navigate community resources without assistance." (AR 1352, 1354.)

Dodson received inpatient psychiatric treatment at St. Joseph Hospital from August 15 through 18, 2014, after "hearing voices which led him to cut himself . . . ." (AR 1270, 1411, 1574.) At a follow-up visit with Dr. Santosh Maharjan on August 20, 2014, Dodson reported that he was still hearing the voices. (AR 1270–72, 1414–17, 1577–79.) On September 10, 2014, Dodson told Dr. Maharjan that "he still hears voices [that] tell[ ] him bad things[,]" that "[h]e is able to ignore it[,]" but that "those voices bother[ ] him." (AR 1266–69.) Dr. Maharjan diagnosed Dodson with worsening psychosis and established a treatment objective of having "less than one [auditory hallucination] per day." (AR 1268.) Dodson reported hearing voices again on January 16, 2015. (AR 1424–26, 1586–88.)

On March 16, 2015, Dodson was admitted to the Bowen Center Inpatient Psychiatric Unit (IPU) for a 72-hour emergency detention after running out of his medication for three weeks due to lack of money. (AR 1170, 1195, 1510.) Dodson "reported hearing voices . . . which were telling him to hurt himself . . . ." (AR 1170, 1195, 1516, 1521.) Dodson was admitted for another 72-hour emergency detention on May 14, 2015 (AR 1463), after he presented at the Parkview Hospital emergency room with "poor focus and communication skills[,]" "mumbl[ing] and us[ing] repetitive speech[,]" and "stat[ing] that he sometimes will stare at the wall and begin speaking to himself and hears voices answer him." (AR 1651.)

On May 19, 2015, Dodson presented at the emergency department of Marion General Hospital with a "suicidal ideation, plan, and intent[;]" he was also having "difficulty with time frames and presented with mild disorganized speech." (AR 1127.) Dodson was admitted for inpatient stabilization at Cornerstone Behavioral Health (AR 1136), where he "reported that he" "has always struggled with" "'trouble thinking' . . . ." (AR 1146.) Jennifer Krynicky, MS, observed that Dodson's "speech presented as mildly disorganized" (AR 1146) and described his thought process as confused, disorganized, and illogical (AR 1149). Dodson told Krynicky that he had experienced hallucinations in the past. (AR 1146.) Krynicky and staff psychiatrist Gregory Richardson, MD, diagnosed Dodson with chronic schizoaffective disorder. (AR 1151–52.) Discharge notes from Michael Conn, MD, state that Dodson "is a very poor historian" and "is vague and circumstantial in his thought process." (AR 1153.)

On August 15, 2015, Dodson was admitted to the IPU for another 72-hour detention after attempting to cut his wrists with broken glass. (AR 1160.) Dodson reported that he had run out of his medications and heard voices that told him to kill himself. (AR 1160, 1185–86, 1492, 1497.) His treatment notes describe him as "a 35 year old male with a long history of functioning marginally. He has been dependent on others for most of his life in some way or another and despite effort has reaped limited benefit. At present[,] he is unable to maintain his psychiatric stability for want of resources to buy medications and homelessness." (AR 1162.) He was diagnosed with several mental health conditions, including psychosis. (AR 1162, 1367, 1485–87, 1499.) During his inpatient stay, Dodson was placed back on his psychiatric medications, "gradually improved in his symptoms[,]" and "stopped having hallucination[s]." (AR 1486.) However, on August 26, 2015, Dodson again reported hearing "voices tell[ing] him to do thin[g]s to hurt himself and not care." (AR 1239–41, 1604–06.)

On December 21, 2015, Dodson told therapist Megan Marsh that he was "hearing voices" "'on a regular basis. I have to fight with it all the time. The voices say, "I'm not worthy. I shouldn't even have a reason to be a live. [*sic.*] I'm always wrong." It's like I have to try not to listen to them.'" (AR 1309, 1371–72, 1539.) A treatment note dated January 22, 2016, states that Dodson reported hallucinations "a few days" after running out of his anxiety medications. (AR 1225–27, 1457–60, 1618–20.)

In early 2016, Dodson moved from Indiana to Tennessee, where, the record indicates, he did not regularly take his mental health medications. (AR 1732–33, 1746–48, 1760, 1763.) Dodson had several emergency room visits for physical ailments or anxiety in 2016 and 2017, in which doctors noted that Dodson said things that "made absolutely NO sense whatsoever" (AR 1732); told doctors he was in severe pain, then repeatedly rated that pain as a zero out of ten (AR 1887–88); told doctors he was allergic to certain medications immediately before requesting the same medications (AR 1889); and complained of ailments that were not supported by physical examinations or tests (AR 1737–38, 1886–88, 1893).

Dodson visited the Plateau Mental Health Center on July 28, 2018, and reported he had "intrusive images of himself jumping out of a car," but denied auditory and visual hallucinations. (AR 1977–78, 2034, 2047.) He received inpatient treatment in the Plateau CSU from September 30 to October 1, 2018. Dodson told CSU staff that he "ha[d]n't been on [his] meds for a long time" (AR 1961), "since [he] moved to T[ennessee]" (AR 1974). He reported having "visual hallucinations 'constantly, [and] describe[d] seeing himself hanging [with] blood running down [his] arms [or] jumping out of [a] car and . . . see[ing] [his] body mangled[.]'" (AR 1953, 1997.) When asked "if he imagines his wrists bleeding out or if he actually sees this," Dodson "report[ed] that he actually sees blood coming out of his wrists." (AR 2060.) Advanced Practice Registered

Nurse Trena Lawson[3] diagnosed Dodson with schizophrenia and panic disorder (AR 1965, 1968, 2016, 2021). Dodson continued to report auditory and visual hallucinations through the date of discharge (AR 1960, 2011).

In light of this extensive record evidence, the ALJ committed reversible error in finding that "there is no medical documentation of delusions, hallucinations, disorganized thinking, or grossly disorganized behavior or catatonia." (AR 25.) Although the record does not include medical treatment records showing that Dodson reported auditory or visual hallucinations or sought mental health treatment in 2016 and 2017 after moving to Tennessee, the absence of such records does not preclude Dodson from meeting the paragraph A criteria of listing 12.03. The requirement that the ALJ make her step-three determination based on longitudinal evidence from various medical and non-medical sources is based on the recognition that individuals with mental impairments may experience "variations in the level of [their] functioning[,]" 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(5)(a), and that such individuals may not "ha[ve] an ongoing relationship with the medical community or . . . currently [be] receiving treatment[,]" *id.* § 12.00(C)(5)(b). Contrary to the ALJ's assessment, Dodson's statements to the consultative psychiatric examiners that he "was not certain if he actually heard voices or if it was his

---

[3]     Because Dodson's claim was filed before March 27, 2017, Lawson is not considered an acceptable medical source capable of establishing the existence of a medically determinable impairment. *See* 20 C.F.R. § 416.902(a)(7). However, Lawson's diagnosis is relevant to establishing the ongoing treatment Dodson received for his mental disorder, is consistent with other medical evidence in the record, and may properly be considered under 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(3), which promises that the SSA "will consider all relevant evidence about [the claimant's] mental disorder . . . that [it] receive[s] from [the claimant] and people who know [the claimant]." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C)(3); *see also id.* § 12.00(C)(5)(b) (recognizing that longitudinal evidence of severe mental disorders may include non-medical sources).

conscience" (AR 25 (citing AR 1826–32, 1928–33)) does not negate years of medical evidence indicating that he experienced auditory hallucinations.

Further, variations in or gaps between Dodson's diagnoses or reports of symptoms do not prevent him from satisfying the duration requirement of 20 CFR § 416.909. The Fifth Circuit has held that,

> [w]hile the mere existence of symptom-free period may negate a finding of disability when a physical impairment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of the claim. Unlike a physical impairment, it is extremely difficult to predict the course of mental illness. Symptom-free intervals, though sometimes indicative of a remission in the mental disorder, are generally of uncertain duration and marked by an impending possibility of relapse. Realistically, a person with a mental impairment may be unable to engage in competitive employment, as his ability to work may be sporadically interrupted by unforeseeable mental setbacks.

*Singletary v. Bowen*, 798 F.2d 818, 821 (5th Cir. 1986) (quoting *Lebus v. Harris*, 526 F. Supp. 56, 61 (N.D. Cal. 1981)); *see also Hutsell v. Massanari*, 259 F.3d 707, 713 (8th Cir. 2001) (holding that, even if claimant with a chronic mental disability was in remission, "it is inherent in psychotic illnesses that periods of remission will occur, and that such remission does not mean that the disability has ceased" (quoting *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996)). As in *Singletary*, Dodson has demonstrated evidence of "years of visits to hospitals and numerous diagnoses of mental problems[.]" 798 F.2d at 822. Therefore, *Singletary* instrucst that Dodson meets the duration requirement because record evidence shows that Dodson has exhibited the symptoms described in paragraph A since at least 2010, with multiple diagnoses of schizophrenia and psychosis during that time. Accordingly, remand is warranted for reconsideration to determine, in light of the longitudinal medical evidence in the record, whether Dodson satisfied the paragraph A criteria.

17

### 2.     Paragraph B of Listings 12.02, 12.03, 12.04, 12.06, and 12.08

Paragraph B requires that a claimant have one "'extreme' limitation" or two "'marked' limitation[s]" in the following "areas of mental functioning[:]" (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A)(2)(b). Dodson argues that substantial record evidence does not support the ALJ's finding that he has only moderate limitations in the areas of interacting with others and adapting or managing himself. (Doc. No. 27-1.)

### a.     Interacting with Others

The SSA defines "[i]nteracting with others" as "the abilities to relate to and work with supervisors, co-workers, and the public." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(E)(2); *see also id.* ("Examples include: cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness."). The SSA states that it "will determine the degree to which [a claimant's] medically determinable mental impairment affects the four areas of mental functioning" listed in paragraph B, including interacting with others, in terms of the claimant's "ability to function independently, appropriately, effectively, and on a sustained basis . . . ." *Id.* § 12.00(A)(2)(b).

The ALJ offered the following analysis regarding Dodson's ability to interact with others under the paragraph B criteria of listings 12.02, 12.03, 12.04, 12.06, and 12.08:

> In interacting with others, the claimant has a moderate limitation. The claimant said he had a fear of being around others and he avoids crowds (Exhibit B18F). Yet he reported he goes shopping in stores twice monthly with others and talks with others

daily. He attends medical appointments (Exhibits B4E, B8E, and B12E). He reported problems getting along with people and said he has no contact with siblings but visits his mother occasionally. He lives with a friend and has contact with her cousin but he otherwise does not interact much (Exhibit B18F). While in treatment, the claimant attended all groups (Exhibit B21F). He said he does not get along with others but did okay with authority figures (Exhibits B4E, B8E, and B12E). Furthermore, he was cooperative on examinations (Exhibits B9F, B14F, B15F, B16F, B18F, and B21F).

(AR 27.)

The Court finds that the ALJ's conclusion that Dodson has only a moderate limitation in interacting with others is not supported by substantial record evidence. The activities cited by the ALJ do not provide substantial support for a finding that Dodson has a fair ability to relate to and interact with others in a workplace setting independently, appropriately, effectively, and on a sustained basis as is required to find that Dodson had a moderate limitation under § 12.00(F)(2)(c).

The ALJ cites the fact that Dodson reported going shopping in stores twice monthly to support a finding that Dodson has a fair ability to relate to and interact with others, but the ALJ's discussion does not accurately reflect this evidence. Dodson reported that he cannot go out alone and "ha[s] to have someone w[ith] him" to shop because he experiences "feelings of passing out and fear" and "do[es] not like being around a lot of people[.]" (AR 993.) Dodson told psychological examiner Mark A. Loftis, Ph.D., in 2016 that "he stays home most of the time" and that "[h]is mother does the grocery shopping . . . ." (AR 1829.) He told psychological examiner Stephen R. Hardison, M.A., in 2017 that he "is home most of the time[,]" "[a] friend will drop him to [his] appointments and usually will go to the store for him[,]" and that "[h]e does not like to be in public." (AR 1932.) Mental health treatment notes from 2014 through 2016 state that Dodson "hears voices that tell him that others are out to get him and will cause harm, which initiates panic attacks. He is scared to be around others or in the community." (AR 1309, 1312, 1314, 1318, 1320, 1322, 1324, 1326, 1328, 1332, 1334, 1348, 1350, 1352, 1354, 1356, 1358, 1360, 1362, 1371, 1374,

1377, 1539, 1542, 1544, 1549, 1551, 1553, 1555, 1557, 1559, 1563.) The evidence that Dodson goes on bimonthly shopping trips accompanied by his mother or his roommate does not support a finding that Dodson has a fair ability to relate to and work with people in a workplace independently, appropriately, effectively, and on a sustained basis. *See Elliott v. Comm'r of Soc. Sec.*, No. 1:20-CV-00545, 2021 WL 2926109, at *15 (N.D. Ohio June 29, 2021) (recommending remand where "ALJ's decision . . . fail[ed] to address how . . . going to the store for short periods of time is reflective of [claimant's] ability to interact with others independently, appropriately, effectively, and on sustained basis, as would be required in a work setting"), *report and recommendation adopted*, 2021 WL 2917647 (N.D. Ohio July 12, 2021).

The ALJ also cites Dodson's ability to attend medical appointments, the fact that he was cooperative during those appointments, and his participation in group therapy during inpatient treatment as evidence that he had a fair ability to relate to and interact with others. (AR 27.) The ALJ's characterization of this evidence also lacks context. *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 378 (6th Cir. 2013 (reversing district court's affirmance of ALJ's denial of benefits where "many of [the ALJ's] examples [we]re either taken out of context or . . . offset by other examples in the record"). Dodson testified that he needs other people, including his roommate, to accompany him to medical appointments. (AR 68–69, 994.) The longitudinal medical evidence supports this testimony, showing that Dodson was often accompanied at his medical and mental-health appointments by friends or by a Rehabilitative Service Provider (RSP) who assisted him in Indiana. (AR 1091, 1180, 1200, 1225, 1228, 1232, 1257, 1263, 1266, 1306, 1315, 1340, 1378, 1414, 1418, 1424, 1430, 1446, 1449, 1453, 1457, 1545, 1577, 1580, 1586, 1607, 1610, 1614, 1618, 1855, 1875.) Notes stating that Dodson cooperated with treatment provide some support for finding that Dodson can interact with others effectively, but do not provide substantial support for

finding that he can do so independently, effectively, and on a sustained basis in a work environment. The treatment records cited by the ALJ to show that Dodson "attended all groups" (AR 27) are from Dodson's inpatient hospitalization from September 28 through October 1, 2018. They show that Dodson met his treatment goal of attending all group sessions *while hospitalized*, and they do not explain whether and how Dodson interacted with other group members during those sessions. (AR 1954.) Again, they do not speak to how Dodson would interact with others in a work environment. Dodson's regular but infrequent interactions with providers, often accompanied by friends or his RSP, and his behavior within a highly structured inpatient environment do not substantially support a finding that he can relate to and work with others in a workplace setting independently and on a sustained basis.

The ALJ also found that Dodson "did okay with authority figures" based on Dodson writing the word "okay" in response to a question asking how well he gets along with authority figures. (AR 27 (citing AR 996).) This conclusion also lacks context, *see Gayheart*, 710 F.3d at 378, because the ALJ does not evaluate that statement in light of Dodson's more specific, conflicting testimony that he has "problems being around people" and "didn't fit in" at work because he was bullied and his employer "did nothing about that" (AR 53, 62), or his report that he had been fired because he "had breakdowns which caused conflicts" with other people (AR 1021).

Dodson's contact with his mother, roommate, and roommate's cousin also does not support a finding that he has a fair ability to interact with others as defined by the regulations. Contact with close family members is not generally indicative of an ability to sustain contact with others in a work environment. *See Elliott*, 2021 WL 2926109, at *15 (recommending remand where "ALJ's decision . . . fail[ed] to address how being able to spend time with only his mother and sister . . .

21

Case 2:20-cv-00048   Document 30   Filed 02/22/22   Page 21 of 29 PageID #: 2235

is reflective of [claimant's] ability to interact with others independently, appropriately, effectively, and on a sustained basis, as would be required in a work setting"). Further, Dodson's relationship with his roommate does not show that he can interact independently with others. Dodson testified that his roommate "does 99, 100 percent of everything[,]" helps him with his medications, and takes him to his appointments. (AR 68–69.) Therefore, the record evidence does not support the ALJ's finding that Dodson can function independently, and remand is warranted for evaluation of Dodson's ability to relate to and work with supervisors, co-workers, and the public. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(E)(2).

### b.    Adapting or Managing Oneself

The SSA defines "[a]dapt[ing] or manag[ing] oneself" as "the abilities to regulate emotions, control behavior, and maintain well-being in a work setting." *Id* § 12.00(E)(4); *see also id.* ("Examples include: Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions.") As with the other areas of mental functioning in paragraph B, the ability to adapt and manage oneself is evaluated in terms of the claimant's "ability to function independently, appropriately, effectively, and on a sustained basis . . . ." *Id.* § 12.00(A)(2)(b).

The ALJ offered the following analysis regarding Dodson's ability to adapt or manage himself under the paragraph B criteria of listings 12.02, 12.03, 12.04, 12.06, and 12.08:

> As for adapting or managing oneself, the claimant has experienced a moderate limitation. He reported he did not handle stress or changes well and reported fears. However, he is independent in personal care and his mood and affect are within

is reflective of [claimant's] ability to interact with others independently, appropriately, effectively, and on a sustained basis, as would be required in a work setting"). Further, Dodson's relationship with his roommate does not show that he can interact independently with others. Dodson testified that his roommate "does 99, 100 percent of everything[,]" helps him with his medications, and takes him to his appointments. (AR 68–69.) Therefore, the record evidence does not support the ALJ's finding that Dodson can function independently, and remand is warranted for evaluation of Dodson's ability to relate to and work with supervisors, co-workers, and the public. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(E)(2).

### b.    Adapting or Managing Oneself

The SSA defines "[a]dapt[ing] or manag[ing] oneself" as "the abilities to regulate emotions, control behavior, and maintain well-being in a work setting." *Id* § 12.00(E)(4); *see also id.* ("Examples include: Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions.") As with the other areas of mental functioning in paragraph B, the ability to adapt and manage oneself is evaluated in terms of the claimant's "ability to function independently, appropriately, effectively, and on a sustained basis . . . ." *Id.* § 12.00(A)(2)(b).

The ALJ offered the following analysis regarding Dodson's ability to adapt or manage himself under the paragraph B criteria of listings 12.02, 12.03, 12.04, 12.06, and 12.08:

> As for adapting or managing oneself, the claimant has experienced a moderate limitation. He reported he did not handle stress or changes well and reported fears. However, he is independent in personal care and his mood and affect are within

normal limits (Exhibits B4E, B8E, B12E, and B14F). His behavior was appropriate (Exhibit B16F) and his appearance within normal limits (Exhibits B21F and B23F).

(AR 27.)

To support the conclusion that Dodson is independent in his personal care, the ALJ cites a function report in which Dodson indicated that he can dress himself, comb his hair, shave, and use the toilet (AR 991.) Dodson's self-report that he could perform some basic daily functions does not substantially support a finding that he can adapt and manage himself in a work environment. *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as [he] would be by an employer.")

Further, Dodson also reports that he has trouble bathing because he "panic[s] around water[,]" needs reminders to go to appointments and do chores, and "needs someone around" when he cooks because he gets anxious and "pass[es] out around heat[.]" (AR 991–92.) Dodson also states that he "can't be left unattended outside due to anxiety" and needs "encouragement" from others because he feels afraid when he attempts to do house and yard work by himself. (AR 992.) Dodson testified that he needs help from his roommate in managing his medications and appointments (AR 68–69.) There is not substantial evidence for the ALJ's finding that Dodson can manage himself independently.

The ALJ also notes that Dodson's appearance was within normal limits during physical examinations performed at his medical appointments and during his CSU hospitalization in September 2018. (AR 27 (citing AR 1949–90, 2072–97).) The ALJ found that Dodson's "mood and affect are within normal limits" based on the October 17, 2016 report of psychological examiner Mark A. Loftis, PhD. (AR 27 (citing AR 1826–32).) The regulations and governing case

law require that the ALJ consider how Dodson's condition varies over time rather than cherry-picking isolated portions of the record. *See Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 F. App'x 488, 494 (6th Cir. 2011) (noting that ALJ's conclusion, based on a two-page excerpt from claimant's medical record, "appears to be grounded in a myopic reading of the record combined with a flawed view of mental illness"); 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(5)(a). When considered in the context of the variations in functioning reflected in Dodson's longitudinal medical record, Loftis's opinion and Dodson's appearance during physical examinations do not substantially support a finding that Dodson can adapt and manage himself in a manner appropriate to a work setting independently, appropriately, effectively, and on a sustained basis. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A)(2)(b), (E)(4).

The ALJ's findings that Dodson had only moderate limitations in interacting with others and adapting or managing himself lack the support of substantial record evidence. The Commissioner has not argued that these errors were harmless, and the Court finds that they were not. A single extreme limitation or two marked limitations is enough to satisfy the paragraph B criteria of listings 12.02, 12.03, 12.04, 12.06, and 12.08. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A)(2)(b). Dodson is entitled to a substantively and procedurally appropriate evaluations of his ability to interact with others and to adapt or manage himself under paragraph B. Further, as explained below, remand is also warranted for reconsideration of whether Dodson satisfied the paragraph C criteria.

### 3.    Paragraph C of Listings 12.03, 12.04, and 12.06

The ALJ offered the following analysis regarding the paragraph C criteria of listings 12.03, 12.04, and 12.06:

> The undersigned has also considered whether the paragraph C criteria of 12.03, 12.04, and 12.06 were satisfied. In this case, the evidence fails to establish the presence of the paragraph C criteria, which evaluate mental disorders that are

24

"serious and persistent." Paragraph C criteria recognizes that mental health interventions may control the more obvious symptoms and signs of a mental disorder. However, there is no evidence that the claimant has minimal capacity to adapt to changes in environment or demands that are not already part of the claimant's daily life. The undersigned finds claimant did not meet the "C" criteria.

Furthermore, a medical condition that can reasonably be remedied by surgery, treatment or medication is not disabling (20 CFR 416.930 (a). The evidence shows the claimant's primary care provider prescribed medication to treat his mental condition (Exhibit B5E). Yet, the evidence also shows the claimant did not take the medication as prescribed (Exhibits B9F, pp. 19, 31; B14F, p. 4; B18F, p. 4; B21F, pp. 5, 26; and B22F, pp. 7, 34).

(AR 27.)

Dodson argues that, contrary to the ALJ's findings, he meets paragraph C's criteria because the record evidence shows that he has minimal capacity to adapt to changes in environment or demands that are not already a party of his daily life. (Doc. No. 27-1.) Dodson also argues that record evidence shows that his failure to take medications as prescribed was because he "doesn't always have the adequate personal resources in order to obtain medication and effective prescribed treatment . . . ." (Doc. No. 29, PageID# 2209.)

The criteria in paragraph C(1) can be satisfied by evidence of a claimant's ongoing reliance on "medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s)" that "diminish[es] the symptoms and signs of [a claimant's] mental disorder . . . ." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(G)(2)(b); *see also id.* (ongoing medical treatment criterion in paragraph C(1) is satisfied "when the medical evidence establishes that [the claimant] obtain[s] medical treatment with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for [the claimant's] medical condition."). The SSA states that it "will consider periods of inconsistent treatment or lack of compliance with treatment that may result from [the claimant's] mental disorder" and that, "[i]f the evidence indicates that the inconsistent treatment or lack of compliance is a feature of [the claimant's] mental disorder, and it

has led to an exacerbation of [the claimant's] symptoms and signs," that the inconsistent treatment or lack of compliance with treatment will not be used "as evidence to support a finding that [the claimant] has not received ongoing medical treatment as required by" paragraph C(1). *Id.*; *see also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) ("For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself."). It is also well established that, if a claimant "'cannot afford the prescribed treatment or medicine, and can find no way to obtain it, "the condition that is disabling in fact continues to be disabling in law[,]"'" even if the condition would otherwise be remediable through treatment. *McKnight v. Sullivan*, 927 F.2d 241, 242 (6th Cir. 1990) (internal citation omitted).

The ALJ erred in not considering whether Dodson's failure to comply with treatment was due to his mental impairment or his inability to afford treatment. Dodson's medical records repeatedly refer to Dodson's financial instability, lack of insurance, and intermittent homelessness as reasons for his noncompliance with treatment. (AR 1162–63, 1170, 1185, 1195, 1228, 1317, 1453, 1486, 1492, 1497, 1499–1500, 1516, 1521, 1547, 1614, 1639, 1641, 1651, 2002.) Dodson's treatment notes state that his mental impairments affect his "[m]edication self-management" (AR 1382, 1385, 1534, 1537) and identify medication compliance as a mental health need for him (AR 1983, 2057). Dodson's mental health providers set treatment goals related to improving his compliance with treatment and worked with him with the goal of improving his medication compliance. (AR 1163, 1168, 1174, 1178, 1183, 1189, 1199, 1310, 1348, 1350, 1352, 1372–73, 1380, 1385, 1477–78, 1496, 1500, 1512, 1520, 1525, 1537, 1540, 1954, 1958, 1989–90, 1996, 1999, 2004, 2007, 2010, 2069–70.) In light of this evidence, it was improper for the ALJ to find that Dodson did not satisfy the paragraph C(1) criteria without considering whether his non-compliance with treatment was a feature of his mental disorder, *see* 20 C.F.R. pt. 404, subpt. P,

app. 1, § 12.00(G)(2)(b), or was due to his inability to pay for treatment, *see McKnight*, 927 F.2d at 242.

The "marginal adjustment" requirement in paragraph C(2) is satisfied "when the evidence shows that changes or increased demands have led to exacerbation of [the claimant's] symptoms and signs and to deterioration in [the claimant's] functioning[.]" 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(G)(2)(c). "[F]or example, [the claimant] ha[s] become unable to function outside of [their] home or a more restrictive setting, without substantial psychosocial supports . . . ." *Id.* The ALJ did not point to any record evidence in support of the determination that Dodson does not satisfy the C(2) criteria and instead generally asserted that "there is no evidence that the claimant has minimal capacity to adapt to changes in environment or demands that are not already part of the claimant's daily life." (AR 27.) As discussed above, there is substantial record evidence showing that Dodson experiences feelings of panic when he leaves his home or attempts household tasks, and Dodson testified that he spends most of his time laying on the couch, does not use a computer, and would struggle to read a standard paperback book. (AR 67–69.) There is also significant evidence that Dodson relies on his roommate for substantial psychosocial support. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(D)(1)(a) (defining psychosocial supports to include "receiv[ing] help from . . . family members or other people who monitor [the claimant's] daily activities and help [the claimant] to function"). It is not evident that the ALJ considered this evidence. The ALJ's opinion therefore fails to "'build an accurate and logical bridge between the evidence and the result.'" *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

Remand is therefore also warranted for reconsideration of whether Dodson satisfies that paragraph C criteria of listings 12.03, 12.04, and 12.06.

## B.  Dodson's Other Claims

Dodson argues, in the alternative, that new material evidence justifies a remand for reconsideration under sentence six of 20 U.S.C. § 405(g). (Doc. No. 27-1.) This argument is moot because the ALJ may consider new evidence on a sentence-four remand. *See Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *6 (S.D. Ohio Dec. 13, 2016) ("'When the Court decides to remand a case under 42 U.S.C. § 405(g), sentence four, that determination ordinarily moots a request for a sentence six remand.'" (citation omitted)); *see also Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 175 (6th Cir. 1994) (holding that "proceedings on remand [under sentence four] may require a rehearing in which additional evidence is introduced").

Similarly, because Dodson's case should be remanded for further development of the record and reevaluation, the Court need not address Dodson's remaining argument that the ALJ failed to properly consider Dodson's hearing impairment in the RFC determination and hypothetical question to the vocational expert. (Doc. Nos. 27-1, 29.) *See Hadi v. Comm'r of Soc. Sec.*, No. 3:16-cv-03014, 2018 WL 1788078, at *5 (M.D. Tenn. Mar. 27, 2018) (declining to address "challenges to the ALJ's treatment of other opinion evidence, the ALJ's credibility assessment, or the ALJ's obesity evaluation" where sentence-four remand was otherwise warranted), *report and recommendation adopted*, 2018 WL 1794658 (M.D. Tenn. Apr. 13, 2018); *Watson v. Comm'r of Soc. Sec.*, No. 2:16-cv-14355, 2018 WL 1404581, at *6 (E.D. Mich. Mar. 2, 2018) (declining to address "[p]laintiff's remaining arguments as to the ALJ's treatment of opinion evidence . . . or the ALJ's consideration of [p]laintiff's ability to stand and walk" where other "reversible error . . . require[d] remand and a re-evaluation of the RFC"), *report and recommendation adopted*, 2018 WL 1399341 (E.D. Mich. Mar. 19, 2018); *Maddex v. Astrue*, No. 3:10CV159, 2011 WL 1990588, at *13 (S.D. Ohio May 2, 2011) (declining to address

plaintiff's remaining arguments after finding "that the ALJ's decision should be reversed for failure to properly consider [p]laintiff's obesity consistent with SSR 02-1p"), *report and recommendation adopted*, 2011 WL 1988537 (S.D. Ohio May 23, 2011).

## IV.  Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that Dodson's motion for judgment on the administrative record (Doc. No. 27) be GRANTED, that the Commissioner's final decision be VACATED, and that this matter be REMANDED to the Social Security Administration for further administrative proceedings consistent with this Report and Recommendation.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 22nd day of February, 2022.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge